UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SIDNEY S. LOXLEY, M.D.,
Plaintiff-Appellant,

v.

CHESAPEAKE HOSPITAL AUTHORITY,

No. 97-2539

Defendant-Appellee,

and

CHESAPEAKE GENERAL HOSPITAL,
Defendant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(CA-97-658-2)

Argued: October 26, 1998

Decided: December 1, 1998

Before WIDENER, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Luttig wrote the opinion, in
which Judge Widener and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Edwin Ford Stephens, CHRISTIAN & BARTON, L.L.P.,
Richmond, Virginia, for Appellant. Judith Bowles Henry, CREWS &
HANCOCK, P.L.C., Richmond, Virginia, for Appellee. **ON BRIEF:**

Hill B. Wellford, III, CHRISTIAN & BARTON, L.L.P., Richmond, Virginia, for Appellant. Thomas F. Hancock, III, Jeannie A. Adams, CREWS & HANCOCK, P.L.C., Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

LUTTIG, Circuit Judge:

Dr. Sidney Loxley appeals the dismissal of his claim under 42 U.S.C. § 1983 that the Chesapeake Hospital Authority violated his rights under the Due Process Clause in refusing to grant him full staff privileges at Chesapeake General Hospital. We affirm.

I.

Dr. Loxley is an orthopedic surgeon who, in August 1992, held unrestricted staff privileges at Chesapeake General ("Hospital") in Chesapeake, Virginia. The Authority, which runs the Hospital, suspended his privileges that month when it learned that he was having an affair with a 17 year-old patient and prescribing birth control pills to her. The State Board of Medicine soon thereafter suspended Loxley's license, reinstating it without restriction in October 1994. Loxley was convicted of contributing to the delinquency of a minor and served six weeks in prison. He has not performed orthopedic surgery at the Hospital since 1992.

Two and a half years later, in January 1995, Loxley applied for new staff privileges. (The Authority had planned to reinstate Loxley in August 1993, but could not do so because his license was still suspended.). The first three committees to consider his application -- the Surgery Department, the Credentials Committee, and the Medical Executive Committee -- all recommended denying it. Loxley appealed to an Ad Hoc Committee, which instead recommended

2

granting him provisional privileges for one year (the standard period), subject to several conditions, including that Loxley secure another doctor to "proctor" his first five major surgeries and either secure a proctor for or videotape the next five. The Authority adopted this recommendation in September 1995. Loxley wrote to the Surgery Department Chairman, Charles McEnroe, that he "certainly" agreed to all the conditions.

Meanwhile, Loxley obtained privileges at Norfolk Community Hospital, the relevance of which we discuss below.

The following June, Loxley applied for reappointment at the Hospital for 1996-97. Loxley, however, had not satisfied the proctoring requirement imposed by the Hospital. Under the Hospital's Medical Staff Bylaws, this failure could have justified automatically denying his application, without any hearing or appeal. See Bylaws § 6.6.1 ("Failure to provide adequate information to document compliance with all qualifications . . . shall be grounds for automatic denial of reappointment. Such action shall not be deemed `adverse action'" under Article XI, which gives right to hearings and appeals); § 11.2(c) (providing for hearing after denial of reappointment, "except as otherwise provided by Section 6.6.1"). Instead of automatically denying Loxley's application, though, the Surgery Department recommended granting a second year of provisional privileges subject to the same conditions as imposed for the first year. The Credentials Committee and the Medical Executive Committee agreed.

Again Loxley appealed to an Ad Hoc Committee and again, after a full hearing, the Committee relaxed the other committees' requirements for Loxley. Specifically, it added two modifications to mitigate the proctoring requirement, which the Committee thought "serve[d] a valuable and reasonable function" of facilitating the Hospital's evaluation of Loxley "by direct observation," but which Loxley had claimed he could not fulfill. First, the Committee expanded the number of possible proctors, allowing any "credentialed member of the Medical Staff . . . (i.e., Active, Courtesy, or Provisional member)" to proctor, rather than just Active Members. Second, it allowed Loxley, as an alternative, to withdraw his application and join a residency program "or program with like components" for a year, after which he "would be eligible to reapply" for full staff privileges. The Authority,

3

after a full hearing, adopted the Ad Hoc Committee's recommendation on April 29, 1997.

Loxley then sued the Hospital and the Authority,* alleging violations of state law and of the Due Process and Equal Protections Clauses of the Fourteenth Amendment. The Authority, without answering, filed a motion to dismiss, and joined to that motion both the Bylaws and affidavits from various doctors and officials of the Hospital. Loxley submitted the transcripts of the two 1997 hearings, along with an affidavit from himself and one of his patients. Various other materials, including affidavits, letters, and Findings of Fact and Decisions from the 1997 Ad Hoc Committee and the Authority also appear in the record before us, although there has been no official discovery. The district court held that the Fourteenth Amendment applied to the Hospital, which is a state entity, but that Loxley did not have a protected property or liberty interest affected by the Authority's actions. It went on to dismiss Loxley's procedural due process claim on summary judgment (in light of the parties' submissions) and his substantive due process claim for failure to state a claim. Finally, the district court dismissed the equal protection claim for failure to state a claim and dismissed Loxley's pendent state-law claims.

Loxley appeals the district court's rejection of his due process claims.

II.

We assume, without deciding, that the Authority has deprived Loxley of a protected property or liberty interest under the Due Process Clause. See Christhilf v. Annapolis Emergency Hosp. Ass'n., Inc., 496 F.2d 174 (4th Cir. 1974), overruled on other grounds, Modaber v. Culpeper Mem. Hosp., Inc., 674 F.2d 1023 (4th Cir. 1982); Duffield v. Memorial Ass'n. of Charleston, 361 F. Supp. 398 (S.D. W.Va. 1973), aff'd., Duffield v. Charleston Area Medical Center, 503 F.2d 512 (4th Cir. 1974). But see Randall v. United States, 30 F.3d 518 (4th Cir. 1994). We agree with the district court, however, that even if the Authority did so, it did not violate Loxley's right to due process.

_____

*The district court later dismissed the Hospital.

This is true of both his procedural due process and "substantive" due process claims.

A.

Notwithstanding the numerous hearings he received, Loxley makes two arguments that the Authority violated his right to procedural due process. We reject both, and affirm the district court's summary judgment on this count.

First, Loxley charges bias. None of the doctors whom he claims were biased, however, was involved in the decision on his application. Loxley focuses on Drs. Richard Holden and Michael Romash, suggesting a conspiracy on their part to undermine him, and attempts to transform that conspiracy into "bias" by the Authority.

Loxley's own claims, however, undermine his allegation of a conspiracy. Holden and Romash are partners with Dr. Samuel Brown. In January 1996, Dr. Brown wrote Loxley that he was willing to discuss proctoring but needed more information, particularly about malpractice coverage. Brown also warned that he did not perform all forms of orthopedic surgery. Soon thereafter, Brown, at the urging of Holden and Romash, withdrew this tentative offer. Holden and Romash, in affidavits, say they were concerned about both liability and "the potential impact on our professional reputations." Loxley now claims that after this incident, "the pool of potential proctors dried up," as numerous "maybes" became "nos." But, before the Authority, Loxley testified that everyone except for Dr. Brown was a definite "no" by the end of 1995, J.A. 251, before he had even heard from Brown. Thus the actions of Holden and Romash with regard to Brown appear not to have affected other doctors at all.

Even if we assume that Drs. Holden and Romash had an active animus toward Loxley, that cannot translate into bias that would violate the Due Process Clause. Dr. Holden, although Chairman of the Authority, recused himself from the Authority's discussions and decisions on Loxley's fate in both 1995 and 1997. Both Holden's affidavit and the transcript of the Authority's March 18, 1997, hearing so confirm. Dr. Romash, who allegedly made derogatory comments about Loxley to Loxley's patients a few months after the Authority's deci-

5

sion, appears not to have been a member of any of the numerous committees that evaluated Loxley's applications. He certainly was not on the Ad Hoc Committees or the Authority. Finally, the assertedly biased Authority gave Loxley more favorable treatment in both 1995 and 1997 than did three other subordinate committees (Surgery, Credentials, and Medical Executive).

In light of all this, there is no merit to Loxley's plea that he must be allowed to depose Holden and others, see Fed. R. Civ. P. 56(f), or that the district court improperly weighed evidence and evaluated credibility in entering summary judgment. We further note that the affidavit of Hospital-employee Leslie Phelps, on which Loxley chiefly focuses, is irrelevant to our conclusion that no reasonable fact-finder could find unconstitutional bias. While Loxley correctly observes that a court considering a motion for summary judgment should resolve all doubt in favor of the nonmovant, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), there is simply no doubt here.

Second, for the first time on appeal, Loxley argues that the Authority relied on "secret" or extraneous evidence in 1997. If true, such would be serious. See Christhilf, 496 F.2d at 177-78. But it is not.

The principal support for this claim fails when it is considered in context. At the Authority's March 18, 1997, hearing, Loxley and Benny Sessions, a non-doctor member of the Authority, discussed the reasons for the Authority's suspension of Loxley's privileges in 1992. Sessions said, "it seems also that we sat here, Doctor, and went through volumes and volumes of cases of problems," to which Loxley replied, "No, sir," and explained the allegations made in 1992. Sessions responded, "But we discussed so many cases here that there was some problems with," to which Loxley replied,"What other cases?"

The very fact of this discussion undermines Loxley's claim. Far from hiding anything, Session was candid, admitted that he was "a little confused" about events five years in the past, and allowed Loxley to explain. Further, the presiding officer cut off Sessions' digression: "Just to clarify what's going on here, we are trying to figure out his current competency; so we're not going to go here and dig records of -- this is not the reason we're here." The officer then ordered a five-

6

minute break, ensuring that Sessions (who did not speak again) would be cut off. We can think of nothing that Sessions or the presiding officer could or should have done differently.

Loxley's reliance on Sessions' statements fails for two other reasons. Sessions based his comments on his prior exposure to the case (or at least thought he did), which precludes any finding of constitutionally improper "bias." See Duffield, 503 F.2d at 517 ("[T]he bias and familiarity with a case, which will disqualify,`must stem from an extrajudicial source. . .'"). Cf. Woodbury, 447 F.2d at 845 ("The consideration on a previous occasion of the plaintiff's qualifications would not demonstrate such bias as to constitute a denial of due process."). Further, the absence of Sessions' name from the Authority's subsequent Findings of Fact and Decision suggests that he did not even participate in the final decision. See J.A. 330 (¶ 8), 331.

B.

We also agree with the district court that the Authority did not violate Loxley's right to "substantive" due process. Because the district court considered matters outside the pleadings, however, we enter summary judgment rather than affirming the district court's dismissal for failure to state a claim.

Substantive due process review entails a consideration of the merits of a hospital's decision rather than just the process by which the hospital reached its decision. Evaluating a doctor's qualifications requires medical expertise and involves the "overriding and compelling state interest in safeguarding and protecting [ ] health, safety and lives." Duffield, 361 F. Supp. at 401. Accordingly, such review is extremely deferential. A hospital's refusal to grant staff privileges does not violate the Constitution provided it

> is based upon any reasonable basis, such as the professional and ethical qualifications of the physicians or the common good of the public and the Hospital. . . . The governing board of a hospital must [ ] be given great latitude in prescribing the necessary qualifications for potential applicants.

7

Woodbury v. McKinnon, 447 F.2d 839, 845 (5th Cir. 1971) (citations and internal quotation marks omitted). See Duffield, 361 F. Supp. at 404 ("Judicial review of the merits of internal hospital decisions is strictly limited and the courts should not substitute their judgment for hospital agency judgment."); Shahawy v. Harrison, 875 F.2d 1529, 1533 (11th Cir. 1989) ("[H]ospital boards possess broad discretion.") (internal quotation marks omitted); Woodbury, 447 F.2d at 845 (holding that hospital satisfies substantive due process if its standards are reasonable and "applied without arbitrariness, capriciousness or unreasonableness.").

The Authority, in concluding that Loxley had not carried his burden of establishing his competency, easily satisfied this standard, notwithstanding Loxley's argument that the proctoring requirement is unreasonable and impossible. First, Loxley himself, in his letter to Dr. McEnroe in 1995, readily agreed to the proctoring requirement. As Loxley no doubt realized, the requirement was clearly reasonable when originally imposed, since he had performed no surgeries for over three years.

Second, the Authority and the Ad Hoc Committee, in 1997, fully considered Loxley's arguments that proctoring was impossible for him, and gave reasonable explanations for rejecting them. See J.A. 278-79, 324-25. Again, Loxley's best evidence proves insufficient when it is considered in context. At the Authority hearing, Dr. Carideo, who had chaired the Ad Hoc Committee, explained his committee's reasoning:

> We didn't think proctoring is such an unusual thing.. . . You can't do things in hospitals unless your peers watch you and make sure that you know what you're doing. . . .[I]t's no more impossible for him to get a proctor to do something than it is for any other person to get a proctor. Proctoring is important. Not just to watch how you do something, but to assess your character, type of person you are, the way you work. . . . [T]o say that it's impossible and therefore it's unreasonable, that doesn't hold. To me the onus falls on you to get your peers to help you; and if all of your peers say, I want no parts of you [sic], then I would ask why. Why?

8

> What's the big conspiracy? Most doctors don't conspire to give you a hard time.

This passage explains Carideo's additional comment that the proctoring requirement "may be impossible. It's not unreasonable." This is not inconsistent nonsense, as Loxley suggests, but rather an observation that if the requirement has proven impossible in practice, Dr. Loxley himself has much to do with that, as the unwillingness of anyone to proctor for him likely says something about his ability or character. We see nothing unreasonable in such a view.

Third, the Authority, in 1997, accepted the Ad Hoc Committee's recommendation both to expand the pool of possible proctors and to allow Loxley the alternative of a one-year residency program, even though under the Bylaws the Authority could have summarily rejected his application. Given that these changes relaxed the requirements that Loxley himself had agreed to, the feasibility of this alternative is irrelevant.

Fourth, the Authority was not unreasonable in viewing Loxley's record at Norfolk Community Hospital as insufficient to establish his competency in lieu of proctoring at the Hospital. The district court found that Loxley "has successfully performed at least 60 surgeries at Norfolk Community. [His] first six (6) months of surgeries at Norfolk Community were subject to post-surgery document review and deemed clinically competent." Dr. McEnroe, however, explained to the Ad Hoc Committee in 1997 that the Hospital's Surgery Department viewed these documents, which were Loxley's own notes from operations, as "a subjective collection of data" needing corroboration with direct "objective assessment" at the Hospital. Two doctors from Norfolk have filed affidavits stating that, although Loxley seemed competent to them, they had "performed no `proctoring' in the sense of direct, constant supervision." One of them, Dr. Archer, is not board certified, as the Authority requires for proctors, and the other, Dr. Wright, is not an orthopedic surgeon. Norfolk also lacks the capacity for all the forms of orthopedic surgery that the Hospital allows its full staff members to perform.

Turning to the procedural matter, we agree with Loxley that the district court, in dismissing this claim pursuant to Fed. R. Civ. P.

9

12(b)(6), improperly considered matters outside the complaint (as does the Authority in urging affirmance). But that does not preclude us from reviewing the district court's decision as one for summary judgment and affirming on that ground, so long as we conclude that Loxley "has been afforded the opportunity to respond in accordance with Rule 56." Jackson v. Procunier, 789 F.2d 307, 310 (5th Cir. 1986). Loxley has received such an opportunity, since he has submitted both the hearing transcripts and affidavits.

The procedural posture of this case closely resembles that in Woodbury, where the Fifth Circuit found no error in the trial court's denial of discovery requests and affirmed summary judgment against a substantive due process claim on a record comprising "a transcript of the hearing, affidavits and exhibits." 447 F.2d at 842. As the court there explained, if a hospital has satisfied procedural due process, and substantial evidence supports that hospital's decision, "that ordinarily ends the matter." Id. at 846 (internal quotation marks omitted). So here, where, as we have explained, the Authority's imposition and continuation of the proctoring requirement were far from arbitrary, capricious, or unreasonable. See 447 F.2d at 845.

None of the issues on which Loxley insists upon discovery would alter this. For example, given that the proctoring requirement is reasonable both on its face and as applied to Loxley, it is irrelevant whether the Authority has required others to undergo proctoring. See Woodbury, 447 F.2d at 842, 845-46. Although Loxley's affidavit complains about the Authority not having produced "the Hearing Record," we have before us both the transcripts of the relevant hearings and the written decisions and findings of fact of those committees. Dr. Brown's letter withdrawing his tentative offer to proctor does not, as Loxley alleges, contradict the affidavits of Brown, Romash, Holden. There is therefore no reason to depose those three individuals.

CONCLUSION

For the reasons stated, we affirm the district court's entry of summary judgment in favor of the Authority on Loxley's procedural due process claim, and we enter summary judgment in favor of the Authority on Loxley's substantive due process claim.

The judgment of the district court is affirmed.

AFFIRMED